**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

George M. Lopez,           )    No. CV-97-224-TUC-CKJ

        Petitioner,      )    <u>DEATH PENALTY CASE</u>

v.                     )

                      )    **ORDER**

Charles L. Ryan, et al.,     )

       Respondents.     )

                      )

                      )

This matter is before the Court on remand from the Court of Appeals for the Ninth Circuit to (1) reconsider Petitioner's procedurally defaulted claims in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and (2) determine how *Martinez* applies to ineffective-assistance-of-counsel ("IAC") claims adjudicated but not factually developed during an initial state post-conviction-relief ("PCR") proceeding due to the ineffectiveness of PCR counsel. (Doc. 142.[1]) Petitioner filed a supplemental brief addressing applicability of *Martinez* to three IAC claims. (Doc. 153.) Respondents filed a response, and Petitioner filed a reply. (Docs. 161, 163.) For the reasons set forth below, the Court finds that further briefing is necessary to determine whether Petitioner has an available remedy in state court for raising his claim alleging ineffective assistance of sentencing counsel for failure to investigate and present mitigating evidence.

---

[1] "Doc." refers to documents in this Court's file. Page references for documents filed through CM/ECF are to the electronic page number.

**PROCEDURAL HISTORY**

In 1990, Petitioner was convicted of child abuse and felony first degree murder in the death of his one-year-old son, Anthony. The trial judge sentenced him to death. On direct appeal, the Arizona Supreme Court affirmed. *State v. Lopez*, 847 P.2d 1078 (Ariz. 1992), *cert. denied*, 510 U.S. 894 (1993).

Following unsuccessful state PCR proceedings, Petitioner sought federal habeas corpus relief.  In December 1999, the Court issued a memorandum of decision and order finding a number of Petitioner's claims procedurally barred, including a claim alleging ineffective assistance of counsel at sentencing for failing to investigate and present mitigating evidence, because the claims had never been fairly presented in state court. (Doc. 53 at 25–26.) Following supplemental merits briefing, the Court denied relief on Petitioner's remaining claims. (Doc. 79.)

On appeal, the Ninth Circuit affirmed except as to the finding of procedural default for the mitigation-related IAC claim. The court concluded that Petitioner made "general allegations of his counsel's lack of penalty phase preparation to the Arizona Supreme Court" and remanded for consideration of the claim, including whether Petitioner was entitled to supplement the record or receive an evidentiary hearing in federal court. *Lopez v. Schriro*, 491 F.3d 1029, 1040–41 & n.8 (9th Cir. 2007). In November 2009, this Court found that Petitioner was not entitled to further develop the claim due to his PCR counsel's lack of diligence in state court and was not entitled to habeas relief in light of the record that was before the state court. (Doc. 130.) Petitioner appealed.

While the appeal was pending, the Supreme Court decided *Martinez v. Ryan*, holding that where IAC claims must be raised in an initial PCR proceeding, failure of counsel in that proceeding to raise a substantial trial IAC claim may provide cause to excuse the procedural default of that claim. 132 S. Ct. at 1320. Subsequently, Petitioner moved the Ninth Circuit to stay his appeal and remand the case in light of *Martinez*. The Ninth Circuit granted the motion, vacated this Court's judgment, and remanded for reconsideration of the denial of

Petitioner's habeas petition. In so doing, the court noted that *Martinez* "appears to affect Lopez's guilt- and penalty-phase ineffective assistance of counsel claims" and directed the Court to specifically address: "(1) the ineffective assistance of counsel claims previously found procedurally defaulted; and (2) how *Martinez* applies to claims of ineffective assistance of counsel who failed to develop a factual record during the initial post-conviction relief proceedings." (Doc. 142.)

In March 2013, the parties completed supplemental briefing. In January 2014, the Ninth Circuit issued an en banc decision in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), which provides significant guidance on the application of *Martinez* to claims adjudicated but not fully developed in state court.

## DISCUSSION

Petitioner seeks reconsideration based on *Martinez* for three claims alleging counsel ineffectiveness for failing to investigate and present evidence to: (1) support a mental state defense at trial ("Claim 12-E"); (2) rebut the "heinous, cruel or depraved" aggravating factor ("Claim 12-A"); and (3) provide the sentencer with all reasonably available mitigation evidence ("Claim 12-B").[2] The Court previously found each of these claims to be procedurally defaulted because Petitioner failed to present them in state court and no remedies remained available to exhaust the claims.[3] (Doc. 53 at 26.)

## I.   Applicable Law

Because the doctrine of procedural default is based on comity, not jurisdiction, federal

---

[2] In its December 1999 order identifying the procedural status of Petitioner's claims, the Court designated the ineffective assistance allegations as Claims 12-A thru K. (Doc. 53.) At issue for purposes of this remand are Claims 12-A, 12-B, and 12-E. For consistency, the Court will continue to refer to the claims as such.

[3] Although the Court found Claim 12-B to be defaulted, that finding was reversed by the Ninth Circuit in Petitioner's first appeal. *Lopez*, 491 F.3d at 1041. The impact of that ruling and of the Ninth Circuit's en banc *Dickens* opinion is discussed more fully in Part IV of this Order.

3

courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, habeas review of a defaulted claim is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. In *Coleman*, the Court held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court established a "narrow exception" to the rule announced in *Coleman*. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez,* 132 S. Ct. at 1320)).

Accordingly, under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim, "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318; *see*

4

1   *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014); *Dickens*, 740 F.3d at 1319–20;

2   *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

3       In a series of recent cases, the Ninth Circuit has provided guidance for applying

4   *Martinez.* The most recent case, *Clabourne*, summarizes the court's *Martinez* analysis.[4] To

5   demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must

6   make two showings. "First, to establish 'cause,' he must establish that his counsel in the state

7   post-conviction proceeding was ineffective under the standards of *Strickland. Strickland*, in

8   turn, requires him to establish that both (a) post-conviction counsel's performance was

9   deficient, and (b) there was a reasonable probability that, absent the deficient performance,

10  the result of the post-conviction proceedings would have been different." *Clabourne*, 745

11  F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of

12  a different outcome "is necessarily connected to the strength of the argument that trial

13  counsel's assistance was ineffective." *Id.* at 377–78. Second, "to establish 'prejudice,' the

14  petitioner must establish that his "underlying ineffective-assistance-of-trial-counsel claim is

15  a substantial one, which is to say that the prisoner must demonstrate that the claim has some

16  merit." *Id.*

17      Under *Martinez*, a claim is substantial if it meets the standard for issuing a certificate

18  of appealability. *Martinez*, 132 S. Ct. 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322

19  (2003)). According to that standard, "a petitioner must show that reasonable jurists could

20  debate whether (or, for that matter, agree that) the petition should have been resolved in a

21

---

22      [4] In *Detrich*, a plurality of the en banc panel held that a "prisoner need show only that

23  his PCR counsel performed in a deficient manner" and "need not show actual prejudice

24  resulting from his PCR counsel's deficient performance, over and above his required

    showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez*

25  requirement." 740 F.3d at 1245 (W. Fletcher, J., plurality). However, as the court noted in

26  *Clabourne*, a majority of the *Detrich* panel rejected that view and concluded instead that to

    demonstrate cause "the petitioner must show that his post-conviction relief counsel was

27  ineffective under *Strickland*." *Clabourne*, 745 F.3d at 376; *see Sexton v. Cozner*, 679 F.3d

    1150, 1157 (9th Cir. 2012).

28

different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El*, 537 U.S. at 336).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668, 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687–88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**II.    Claim 12-E: Mental State Defense**

To excuse the default of Claim 12-E, Petitioner argues there is a reasonable probability his state PCR petition would have been granted had PCR counsel raised an IAC claim based on trial counsel's failure to investigate and present a mental state defense. The argument Petitioner contends PCR counsel should have pursued is that Petitioner received ineffective assistance of counsel at trial because his attorneys failed to investigate and present relevant mental health evidence that would have supported defense counsel's theory at

1  trial—that Petitioner did not intentionally commit child abuse. Because this trial-level IAC

2  claim lacks merit, Petitioner has failed to establish a reasonable probability of a different

3  result had PCR counsel raised it in the state PCR petition. Therefore, he has failed to

4  establish cause under *Martinez* to excuse the procedural default of Claim 12-E.

5        **A.    Relevant Facts**

6        Petitioner met Anna Abeyta in 1987, and together they had a son, Anthony. On

7  August 26, 1989, when Anthony was one year and nine days old, Anna left the family

8  apartment to go grocery shopping, leaving Anthony in Petitioner's care. (RT 4/5/90 at 116.[5])

9  When she returned home two hours later, Petitioner told her there had been an accident. (*Id.*

10 at 118.) Petitioner claimed that Anthony, who was learning to walk, was standing in front of

11 a nightstand in the bedroom and had pulled it over on top of himself. (*Id.* at 128–29.)

12       Anna saw that Anthony had a bruise on both his forehead and chin, and that he felt

13 cool to the touch. (*Id.* at 128, 133.) She wanted to take him to the hospital, but Petitioner

14 refused, saying he would be okay. (*Id.* at 133.) Later, Anna noticed that Anthony's stomach

15 felt hot and he was acting fussy. (*Id.* at 134.) She again suggested taking Anthony to the

16 hospital, and Petitioner again refused. (*Id.* at 135.) After leaving to do laundry, Anna returned

17 to find Petitioner performing CPR on Anthony. (*Id.*) They took him to the emergency room,

18 but resuscitation efforts were unsuccessful. (*Id.* at 138, 114–15.) Anthony was declared dead

19 at 3:36 p.m. (*Id.* at 115.)

20       At the time of his death, Anthony had bruises and abrasions on his ear, a bruise on the

21 bridge of his nose, and multiple hemorrhages in his lips. (RT 4/6/90 at 82, 79, 78.) The

22 medical examiner testified that these injuries had been inflicted within 24 hours of his death.

23 (*Id.* at 78–80.) Anthony also had bruises above his eyebrows, on the side of his jaw and under

24 his chin, which the medical examiner testified were older injuries. (*Id.* at 80–81.) The

25 ─────────────

26 [5]  "RT" refers to the reporter's transcripts from Petitioner's state court proceedings.
    "ROA" refers to the state court record on appeal. The original transcripts and certified copies

27 of the state trial and post-conviction records on appeal were provided to this Court by the

28 Arizona Supreme Court on June 16, 1997. (Doc. 20.)

medical examiner also found bruises of various ages ranging from Anthony's left underarm down to his chest, on the right side of his back, and on the right side of his chest and shoulder. (*Id.* at 96–97.)

An autopsy revealed that Anthony's skull had been broken with such force that the right side had been driven into his brain. (*Id.* at 87–88.) Head fractures had caused extensive bleeding in the membrane separating Anthony's brain from his skull. (*Id.* at 90.) In addition, two of Anthony's ribs were fractured near the spine, corresponding to the bruises on his back and causing a bruise on his lung. (*Id.* at 104.) The medical examiner determined that these fractures had occurred within 24 hours of Anthony's death. Additional fractures found on several ribs were found to be older injuries that had been healing when Anthony died. (*Id.* at 104–06.)

The autopsy also revealed that Anthony's pancreas had been torn in half, his bowel and the membrane holding it in place had been lacerated, and his spleen and adrenal gland had hemorrhaged. (*Id.* at 107–09.) Anthony's abdomen contained "bloody, foul-smelling" fluid and the membrane lining his intestine had been infected or inflamed. (*Id.* at 102–03.) The injuries to Anthony's abdomen had caused peritonitis (infection and inflammation of the gastrointestinal organs). (*Id.* at 110–11.) All of these injuries had been caused within 24 hours of death. (*Id.* at 104, 110–13.) The medical examiner determined that Anthony died from "blunt-force trauma to the head, chest and abdomen." (*Id.* at 113.)

At the hospital, Petitioner was interviewed several times over a three-hour period by various law enforcement officers. To each, he provided somewhat different variations of the "nightstand" story he had told Anna. Immediately after Anthony's death, Petitioner told the first officer that although Anthony appeared to be "okay" after the nightstand incident, Petitioner watched him closely for the next two hours. (RT 4/6/90 at 9–10.) Petitioner stated that later, when he was helping Anna with the laundry, he noticed that Anthony was not breathing, so he performed CPR and he and Anna took Anthony to the hospital. (*Id.* at 10–11.)

Later that afternoon, after initially telling two detectives that a nightstand had fallen on Anthony, Petitioner told several different versions of what happened. (*Id.* at 170–88.) First, Petitioner said that Anna was home at the time of the accident. (*Id.* at 169-70.) Next, Petitioner claimed that Anthony had actually climbed inside the middle drawer of the nightstand and that, not only had the nightstand fallen on him, but also a bookshelf, fan, lamp, and radio.[6] (*Id.* at 174, 177.) Petitioner claimed that, as he returned to the bedroom, a bookshelf began to fall. In an attempt to prevent the articles on the shelf from falling on Anthony, he dove, landing on the nightstand, which then fell. (*Id.* at 185–86.) Subsequently, Petitioner admitted to hitting Anthony on the buttocks, despite his earlier statement that he never spanked or physically beat the baby. (RT 4/2/90 at 78, 86–87.)

Finally, Petitioner made additional statements to a detective who specialized in child abuse and homicide. (RT 4/6/90 at 56–57.) Petitioner again denied ever hitting Anthony but later stated:  "I got angry, I got angry at everything, everything that has been boiling over. I've been very angry these past couple of days and Anna knows that and everybody knew it." (*Id.* at 58–59, 64.) Petitioner further said that earlier that day he had given Anthony a bath and laid him down to put lotion on him and "he peed, so I smacked him."  (*Id.* at 60.) Petitioner then explained that he got angry and left the room to dispose of the diaper. (*Id.* When he returned, Anthony was standing by the nightstand. (*Id.* at 61.) Petitioner yelled, Anthony grabbed at the lamp and nightstand, and the nightstand fell on top of Anthony. (*Id.* While trying to secure the lamp, radio, and fan, Petitioner fell on top of the nightstand with Anthony underneath. (*Id.* at 62.) When Petitioner pulled the items away, the radio accidentally slipped and fell on Anthony's face.

Detectives consulted with the medical examiner, who asserted that the injuries Anthony suffered were not consistent with Petitioner's stories. (*Id.* at 115–20.) A search warrant was obtained, and the detectives went to the apartment with Petitioner, who

---

[6]  However, when detectives visited the apartment, they found the fan with an undisturbed coat of dust and a dust ring around the base of the lamp. (RT 4/6/90 at 31.)

9

demonstrated how Anthony was injured. (*Id.* at 18–32.) After the demonstration, Petitioner was arrested.

At trial, Petitioner was represented by lead counsel, Sean Bruner, and associate counsel, Jacqueline Marshall.[7] In his opening statement, Bruner told the jury that the "single question of this case . . . is what was going on in Mr. Lopez's mind during the critical few hours last August when Anthony Pena died." (RT 4/5/90 at 102.) He described Petitioner as a man "who has had problems" and who "lost it, maybe" but said Petitioner was "not a man who intended to kill his baby." (*Id.* at 104–05.) He further stated that the defense would not attempt to establish Petitioner's innocence but instead reminded the jury that the State had the burden to prove beyond a reasonable doubt that Petitioner knowingly and intentionally committed child abuse. (*Id.* at 103.) The defense ultimately presented no witnesses, and Petitioner did not testify. In closing arguments, Bruner reiterated to the jury that "the only issue in this case is intent" and argued that the State had failed to meet its burden of proof. (RT 4/10/90 at 82–87.) Bruner also argued that, at most, Petitioner was guilty of reckless child abuse because Petitioner did not intentionally or knowingly cause injury to Anthony. (*Id.* at 92–93.) In support, he referenced testimony at trial concerning Petitioner's love and care for Anthony, the fact that Petitioner was recently divorced and had worked without a day off in the two weeks prior to the offense, and his emotional distress following Anthony's death. (*Id.* at 74–78.)

The trial court instructed the jury on only one theory of first degree murder: felony murder based on intentional or knowing child abuse as the predicate felony. (*Id.* at 123.) The court explained to the jury that child abuse "is committed when any person causes a child to suffer physical injury under circumstances likely to produce death or serious physical injury." (*Id.* at 120.) The court further explained that the crime of intentional or knowing child abuse

---

[7] Jacqueline Marshall currently sits as a U.S. Magistrate Judge for the District of Arizona.

includes the lesser-included crime of reckless child abuse. (*Id.*) In defining these mental states, the court instructed:

> Intentionally means, with respect to a result or the conduct described by the statute defining an offense, that a person's objective is to cause that result or to engage in that conduct.
>
> Knowingly means, with respect to the conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his conduct is of that nature or that the circumstance exists.
>
> Recklessly means, with respect to the conduct or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.
>
> The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in their situation.

(*Id.* at 121.) The court further instructed that, if there was proof beyond a reasonable doubt of reckless child abuse, the jury was permitted to find Petitioner guilty of this lesser-included offense only if the evidence did not show beyond a reasonable doubt that Petitioner was guilty of intentional or knowing child abuse. (*Id.* at 122.) In other words, the jury had to first determine whether Petitioner was guilty of the charged offense before it could consider any lesser-included crimes.

## B.   Analysis

Petitioner argues that trial counsel was deficient for failing to investigate and present evidence of Petitioner's neurological impairments and resulting character trait for acting reflexively under stress to demonstrate that Petitioner committed child abuse only recklessly, not intentionally or knowingly (Claim 12-E). He asserts that had such evidence been presented, there is a reasonable probability the jury would have found him not guilty of intentional or knowing child abuse and, consequently, not guilty of felony murder. Because there is no reasonable probability either that the trial court would have admitted the expert opinion evidence Petitioner now contends trial counsel should have developed or that evidence of an impulsive character trait would have affected the jury's verdict, the Court

1    finds no reasonable probability that Petitioner would have obtained post-conviction relief had

2    PCR counsel raised Claim 12-E in the PCR petition. Therefore, Petitioner has failed to

3    establish cause under *Martinez*, and Claim 12-E remains procedurally barred.

4            Petitioner contends that trial counsel should have developed and presented evidence

5    from experts, such as those he has consulted in these federal habeas proceedings. Dr. James

6    Sullivan, a neuropsychologist, examined Petitioner in September 2012. According to his

7    report, Petitioner has a weak working memory and impaired executive functions, including

8    the ability to abandon a previous response and generate a new one, to reason from specific

9    circumstances to general rules (inductive reasoning), and to monitor both external and

10   internal cues and modulate behavior accordingly (response inhibition and impulse control).

11   (Doc. 158 at 113.) Dr. Sullivan observes that these impairments are common for individuals

12   such as Petitioner who have experienced closed head injuries or exposure to alcohol in utero

13   and are exacerbated by stress. (*Id.* at 115–16.) He further opines that Petitioner has character

14   traits associated with a tendency to act without reflection and that Petitioner's "actions during

15   the instant offense were very likely impulsive, lacking in response inhibition, and lacking in

16   reflection as opposed to being the product of calculation, intention, and/or deliberation." (*Id.*

17   at 116.)

18           Dr. Julian Davies, M.D., examined Petitioner in February 2013. According to his

19   report, Petitioner has a Fetal Alcohol Spectrum Disorder, specifically Severe Facial Features

20   of FAS/Neurobehavioral Disorder (Alcohol Exposure Presumed), which he states is

21   equivalent to Alcohol-Related Neurodevelopmental Disorder, but with the unique facial

22   features of FAS. (Doc. 163-1 at 8.) According to Dr. Davies, brain injuries caused by

23   prenatal alcohol exposure are variable, but can include lower IQ, attention

24   deficit/hyperactivity disorder, difficulties with judgment and impulse control, language and

25   social difficulties, learning disabilities, memory problems, and impairments in "higher-level"

26   cognitive skills like flexibility, planning, organization, inhibition, and novel problem-solving.

27   (*Id.* at 2.)

28

1       As an initial matter, the Court finds that any expert testimony opining that Petitioner

2   probably acted impulsively at the time of the offense or that he suffers from a specific mental

3   disease likely would not have been admitted. At the time of Petitioner's trial, it was settled

4   that "Arizona does not allow evidence of a defendant's mental disorder short of insanity

5   either as an affirmative defense or to negate the *mens rea* element of a crime." *State v. Mott*,

6   931 P.2d 1046, 1051 (Ariz. 1997) (citing *State v. Ramos*, 648 P.2d 119, 121 (Ariz. 1982);

7   *State v. Laffoon*, 610 P.2d 1045, 47 (Ariz. 1980); *State v. Briggs*, 542 P.2d 804, 807 (1975);

8   *State v. Schantz*, 403 P.2d 521, 529 (Ariz. 1965)). Simply put, a defendant cannot present

9   evidence of a mental disease or defect nor assert a lack of capacity to form the requisite

10   mental state for a charged offense due to such disease or defect. *Id.* at 1050; *see also Clark*

11   *v. Arizona*, 548 U.S. 735, 757–60 (2006) (observing that Arizona permits "observation"

12   evidence about a defendant's "tendency to think in a certain way and his behavioral

13   characteristics" but restricts the use of mental-disease evidence, testimony about what may

14   characteristically go through the mind of someone suffering from a particular mental disease,

15   and evidence of a defendant's capacity to form *mens rea*); *State v. Wright*, 155 P.3d 1064,

16   1068–69 (Ariz. App. 2007) (noting that an expert's opinion about whether a defendant

17   suffers from a mental disease or defect or whether such disease leaves a defendant incapable

18   of forming a particular mental state is inadmissible unless used to support an insanity

19   defense).

20       Recognizing that trial counsel would have been precluded from using expert evidence

21   of a mental disease or defect to demonstrate diminished capacity, Petitioner argues instead

22   that evidence of his neurological deficits would have been admissible under Rule 404(a)(1)

23   of the Arizona Rules of Evidence and *State v. Christensen*, 628 P.2d 580, 582–83 (Ariz.

24   1981), to demonstrate that he had "character traits associated with a tendency to act without

25   reflection." (Doc. 153 at 54.) In *Christensen*, the defendant sought to admit psychiatric

26   testimony, based on the expert's evaluation and testing of the defendant, regarding the

27   defendant's difficulty dealing with stress and his tendency to act more reflexive than

28

reflective. The Arizona Supreme Court held it was error to exclude such testimony because "establishment of [this character trait] tends to establish that appellant acted impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide." *Id.* at 583.

However, the *Christensen* rule is limited in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the offense. *Id.* at 583–84; *see also State v. Arnett*, 760 P.2d 1064, 1071 (Ariz. 1988) (emphasizing that although expert testimony is admissible to establish a personality trait of acting without reflection, testimony of a defendant's probable state of mind at time of the offense is not permitted). Nor does *Christensen* permit evidence of a mental disease or defect as a foundation for demonstrating an impulsive character trait. *Mott*, 931 P.2d at 1051. Thus, there is no reasonable probability the trial court would have permitted testimony from an expert such as Dr. Sullivan that Petitioner's "actions during the instant offense were very likely impulsive, lacking in response inhibition, and lacking in reflection." (Doc. 158 at 116.) Similarly, the court likely would not have permitted testimony from a physician such as Dr. Davies to opine that Petitioner suffers from FAS or to describe the types of deficits that generally occur in individuals with FAS. *See State v. Rivera*, 733 P.2d 1090, 1097 (Ariz. 1987) (finding that testimony as to how alcohol affects thinking processes, thus supporting claim that the defendant acted reflexively, not indicative of a personality trait and thus inadmissible).

There appears to be a question whether, at the time of Petitioner's trial in 1990, *Christensen* was limited to the presentation of character trait evidence to negate only premeditation, rather than other culpable states of mind. *See, e.g.*, *State v. Gonzales*, 681 P.2d 1368, 1371–72 (Ariz. 1984) (finding relevant and admissible expert testimony of impaired cognitive functioning on the question of whether the defendant knowingly restrained the victim), *overruled by Mott*, 931 P.2d at 1054. Arizona courts have since resolved that issue against Petitioner. *See State v. Lopez*, 323 P.3d 748, 752 (Ariz. App. 2014) (holding that *Christensen* is limited to cases involving evidence offered to rebut premeditation); *State v. Buot*, 306 P.3d 89, 93 (Ariz. App. 2013) ("[W]e do not understand *Christensen* to require a

14

court to admit character trait evidence of impulsivity to prove a defendant did not act knowingly or recklessly for purposes of second-degree murder."). Regardless, this issue need not be resolved here because even assuming trial counsel had presented evidence of Petitioner's general trait to act without reflection, there is no reasonable probability of a different outcome.

As already noted, no expert would have been allowed to testify about any specific mental disease or defect, or Petitioner's probable state of mind at the time the offense occurred. *Christensen*, 628 P.2d at 583–84. Rather, the testimony "would have been limited to a general description of [Petitioner's] behavioral tendencies." *Moormann v. Stewart*, 628 F.3d 1102, 1108 (9th Cir. 2010) (internal citation omitted). Furthermore, evidence that Petitioner tended to act without reflection would have had little probative value on the question of whether Petitioner, at a minimum, knowingly committed child abuse. *See, e.g.*, *Wright*, 155 P.3d at 1069 (finding the defendant's "borderline to low average intelligence" and attention-deficit/hyperactivity, learning, and anxiety disorders irrelevant to whether the defendant knowingly committed an act). In other words, even if there is a reasonable probability evidence of an impulsive character trait would have raised a question in at least one juror's mind as to whether Petitioner intentionally committed child abuse, there is no reasonable probability such evidence would have negated the alternative "knowingly" *mens rea* for the charged offense.

In Arizona, felony murder "requires no specific mental state other than that which is required for the commission of any of the felonies enumerated in the statute." *State v. Woratzeck*, 657 P.2d 865, 868 (Ariz. 1982); A.R.S. § 13-1105(B) (West 1989). Here, as the predicate felony for first degree felony murder, Petitioner was charged with intentionally *or* knowingly causing physical injury under circumstances likely to produce death or serious physical injury.[8] A.R.S. § 13-3623(B)(1) (West 1989); A.R.S. § 13-

---

[8] Although the jury was instructed on the lesser-included offense of reckless child abuse, it was also instructed that it could not find Petitioner guilty of this lesser-included offense before first determining that the evidence did not establish beyond a reasonable doubt

1105(A)(2) (West 1989). Child abuse is done "knowingly" if a defendant is aware or believes that his conduct will cause physical injury under circumstances likely to produce death or serious physical injury. A.R.S. § 13-105(6)(b) (West 1989). Here, the State presented overwhelming evidence to support such a finding.

The medical examiner testified that Anthony had bruises on his face, chest, back, and buttocks. Some of the bruises had occurred within 24 hours of Anthony's death, but others were older. He further testified that Anthony's skull was fractured in two separate places and that one of the fractures had been caused with such a great amount of force that part of the fractured skull had been driven into Anthony's brain. In addition, two of Anthony's ribs had been fractured within 24 hours prior to death and several other ribs were healing from being broken in the past. The injury to Anthony's abdomen tore his pancreas in two, lacerated his bowel and the membrane holding it in place, and caused bleeding in his spleen and adrenal gland.

In light of the number, range, and severity of Anthony's injuries—as well as Petitioner's delay in seeking treatment and his concocted "nightstand" stories to Anna and investigators—it is not reasonably probable that evidence of a behavioral tendency to act without reflection would have swayed any of the jurors to find that the State had failed to prove beyond a reasonable doubt that Petitioner was aware his conduct would cause physical injury under circumstances likely to produce death or serious physical injury. Indeed, Petitioner's own expert does not suggest that Petitioner was unaware either that Petitioner injured Anthony or that his conduct was likely to produce death or serious physical injury; he opined only that Petitioner's actions were not the product of "calculation, intention and/or deliberation." (Doc. 158 at 116.) However, Arizona's "knowing" mental state requires none of these thought processes. Because there is no reasonable probability Petitioner would have

that Petitioner was guilty of intentional or knowing child abuse. Thus, Petitioner's assertion that the case hinged on whether his actions were intentional or reckless (Doc. 163 at 40) ignores both the alternative "knowingly" mental state of the charged offense and the fact that the jury would not have considered recklessness before first determining whether the State had proven intentional or knowing child abuse.

succeeded on an IAC claim based on trial counsel's failure to investigate and present evidence of an impulsive character trait, PCR counsel was not ineffective for failing to assert the claim.

## III.   Claim 12-A: Aggravation Rebuttal Evidence

To excuse the default of Claim 12-A, Petitioner argues there is a reasonable probability his state PCR petition would have been granted had PCR counsel raised an IAC claim based on sentencing counsel's failure to investigate and present expert testimony to rebut the "heinous, cruel or depraved" aggravating factor. The argument Petitioner contends PCR counsel should have pursued is that Petitioner received ineffective assistance of counsel at sentencing because his attorneys failed to investigate and present evidence that would have rebutted the State's expert's testimony concerning the extent of the victim's pain and suffering. Because this sentencing-level IAC claim lacks merit, Petitioner has failed to establish a reasonable probability of a different result had state PCR counsel raised it in the PCR petition. Therefore, he has failed to establish cause under *Martinez* to excuse the procedural default of Claim 12-A.

### A.   Relevant Facts

Following Petitioner's conviction, the trial court held an aggravation/mitigation hearing. The State called as a witness Dr. George Hobeich, a pediatrician. Dr. Hobeich testified that Anthony's rib fractures would have affected the child's ability to breathe; that the skull fractures would have caused excessive pain and swelling; that the lacerated bowel would have been very painful, "like somebody performing surgery done on you without anesthesia;" that Anthony would have suffered severe pain in the several hours before he was taken to the hospital; and that Anthony probably remained conscious for at least 45 minutes to an hour. (RT 5/10/90 at 120–21, 124–25, 129, 136–37.) He further testified that a child with injuries such as Anthony's might have survived if treatment had been sought right away and that such patients usually experience seizures, cry loudly at the outset, and then cry "like a cat" as blood and energy deplete. (*Id.* at 129–32, 135–36.)

At sentencing one week later, the trial court found the existence of two aggravating factors:  (1) the offense was committed in an especially heinous, cruel, or depraved manner, pursuant to A.R.S. § 13-703(F)(6); and (2) the victim was under 15 years of age, pursuant to A.R.S. § 13-703(F)(9).[9] After considering Petitioner's proffered mitigation, the Court imposed the death penalty, explaining:

> The victim, a child of 12 months and 9 days of age, was at the mercy of the defendant with no ability to protect or defend himself. His suffering was apparent or foreseeable, but defendant's selfish concern to shield himself from the consequences of his own actions caused him to deny the child any hope for life or the surcease of his pain through medical treatment.

> The Court finds that the cruelty and depravity of defendant's acts towards the innocent, helpless baby in his care far outweigh any evidence which might call for leniency.

(RT 5/17/90 at 19–20.)

On direct appeal, the Arizona Supreme Court conducted an independent review and affirmed Petitioner's sentence. With respect to the "heinous, cruel, or depraved" (F)(6) aggravating factor, the court stated:

> A murder is especially cruel if the victim consciously experienced physical or mental pain and suffering prior to dying. A doctor who had reviewed the hospital records and the autopsy report testified as to the pain Anthony must have suffered from the numerous injuries inflicted on him. The doctor, board certified in pediatrics and in trauma and emergency room medicine, had also spent four years in residency in child abuse. He testified that the skull fractures, especially the one where a piece of the child's skull was driven into his brain, would have caused Anthony "an excessive amount of pain." He stated that the abdominal injuries, the torn pancreas and bowel would have been very painful, "like somebody performing surgery without anesthesia." Anthony was conscious and felt this pain for at least 45 minutes before he slipped into a coma. Anthony must also have suffered some mental anguish while he remained conscious, knowing that one of the two people he depended on and trusted to care for and love him had beaten him repeatedly about the head and body and did nothing to stop the pain and comfort him. We believe the trial court correctly found that Lopez murdered Anthony in an especially cruel manner.

> The other two factors, heinousness and depravity, focus on the murderer's state of mind at the time of the murder.

> Five factors are looked at to determine whether a murderer acted in a heinous or depraved manner: (1) the murderer's relishing of the murder; (2) the infliction of gratuitous violence on the victim beyond that necessary to

---

[9] Section 13-703 (West 1989) has since been renumbered as A.R.S. 13-751 (2011).

commit the murder; (3) the needless mutilation of the victim; (4) the senselessness of the murder; and, (5) the helplessness of the victim. Although the factors of senselessness and helplessness of the victim need not always, by themselves, justify a finding that the murder was heinous or depraved, they do inform the trial court of the defendant's mental state.

The murder of Anthony was senseless. Lopez admitted that after he had given Anthony a bath and was putting lotion on him, the infant "peed, so I smacked him." While such a reaction might be excused as a momentary flash of anger, the continued beating Anthony received, as evidenced by the extent of his injuries, bespeaks a "shockingly evil" mind and constitutes heinous conduct. We can conceive of no act more senseless than beating a one-year-old child to death.

Anthony was clearly helpless and unable to defend himself from the blows inflicted by Lopez and unable to seek aid for his injuries. The one person who could have sought medical help for Anthony, Lopez, took pains to make it appear that an accident had occurred. In addition, when Anthony's mother returned to the apartment and wanted to take Anthony to the hospital, Lopez refused. While Lopez attempted to conceal the beating he had administered, Anthony lay on the couch in pain, suffering seizures, according to the medical testimony, as a result of the injuries to his brain. According to the medical testimony, if Anthony had been brought to the hospital sooner, he might have lived. Lopez' decision to protect himself at the expense of the life of his one-year-old son is the essence of depravity.

We believe the record amply supports a finding that Lopez was in a heinous and depraved state of mind when he beat Anthony. The trial court did not err in finding the aggravating circumstance that the murder was committed in an especially cruel, heinous, or depraved manner.

*Lopez*, 847 P.2d at 1090–91 (citations omitted).

## B.   Analysis

Petitioner argues that trial counsel was constitutionally deficient for failing to investigate and present expert evidence to rebut the testimony during the aggravation/mitigation hearing of the State's medical expert, Dr. Hobeich, that supported the (F)(6) aggravating factor. He asserts that had such evidence been presented, there is a reasonable probability the sentencing court or the Arizona Supreme Court would have concluded that the "heinous, cruel, or depraved" aggravating factor was either not proven or that its weight was seriously diminished and, consequently, not sentenced him to death.[10]

---

[10]   Petitioner also asserts for the first time in his supplemental brief that there is a reasonable probability Dr. Hobeich's testimony would not have been admitted had sentencing counsel challenged the reliability of his opinions. (Doc. 153 at 18 & n.5.) Other than citing a couple of state cases regarding the general proposition that expert testimony

1   Because there is no reasonable probability that the expert opinion evidence Petitioner now

2   contends trial counsel should have developed would have affected the sentencer's or the

3   Arizona Supreme Court's aggravation findings, the Court finds no reasonable probability that

4   Petitioner would have obtained post-conviction relief had PCR counsel raised Claim 12-A

5   in the PCR petition. Therefore, Petitioner has failed to establish cause under *Martinez*, and

6   Claim 12-A remains procedurally barred.

7       Petitioner contends that trial counsel should have developed and presented evidence

8   from an expert, such as Dr. Steven Dunton, who is board-certified in both pediatrics and

9   forensic pathology. According to Dr. Dunton, Anthony's injuries, "while grave and

10  eventually fatal, would not necessarily have placed a reasonable parent on notice that the

11  child needed immediate medical attention." (Doc. 37, Ex. 4 at 2.) In his view, Dr. Hobeich's

12  testimony that Anthony would have suffered seizures and cried loudly was speculative. (*Id.*)

13  Dr. Dunton further opines that although Anthony "certainly suffered pain from his injuries,

14  any hypotheses about the intensity of that pain are highly speculative" and that he "cannot

15  conclude to any level of scientific probability that [Anthony] suffered pain beyond [the] norm

16  of that suffered by other victims of first degree murder." (*Id.* at 2–3.) To this end, he disputes

17  Dr. Hobeich's conclusion that Anthony would have experienced at least 45 minutes of pain

18  before losing consciousness or that Anthony suffered pain on the level of "surgery without

19  anesthesia." (*Id.* at 3.)

20      As set forth in Arizona's (F)(6) aggravating factor, "cruel," "heinous," or "depraved"

21  are stated in the disjunctive, and "any one of them individually may constitute an aggravating

22  circumstance." *Lopez*, 847 P.2d at 1090 (citations omitted). In addition, (F)(6)'s cruelty

23  prong may be established by proving beyond a reasonable doubt that the victim "consciously

24  experienced physical *or* mental pain and suffering prior to dying." *Id.* (emphasis added).

25  Considering Petitioner's allegations in light of state law interpreting and applying the (F)(6)

26  _____

27  must be reliable, he makes no specific argument to support this allegation. Assuming without
    deciding that the issue is properly before this Court, Petitioner's speculative and conclusory

28  allegation is insufficient to establish a claim of ineffective assistance of sentencing counsel.

prongs, the Court finds there is no reasonable probability that either the sentencing judge or the Arizona Supreme Court would have found the (F)(6) factor not proven even had sentencing counsel called its own expert to rebut the testimony of Dr. Hobeich. Therefore, PCR counsel was not ineffective for failing to raise this meritless claim in post-conviction proceedings.

First, Petitioner's new expert evidence does little to refute the State's allegation that Anthony experienced physical pain prior to dying and that Petitioner knew or should have known of the suffering. Dr. Dunton's affidavit expressly acknowledges that Anthony "certainly suffered pain from his injuries" but focuses on the *intensity* of the pain and states that he cannot conclude that Anthony suffered pain "beyond [the] norm of that suffered by other victims of first degree murder." (Doc. 37, Ex. 4 at 2.) Further, Dr. Dunton does not suggest that Petitioner could not foresee that his actions would cause Anthony to suffer physical pain. Rather, he states only that a "reasonable parent" would not "necessarily" have been on notice that the child needed immediate medical attention. (*Id.*)

Petitioner cites no Arizona authority to suggest that the (F)(6) cruelty prong can be established only by a specific and extraordinary level of pain or a showing of physical distress sufficient to indicate the necessity for medical intervention.[11] Under Arizona law, a murder is especially cruel if it involved "the infliction of pain on a victim," and the defendant intended or reasonably foresaw "that the victim will suffer as a consequence of the defendant's acts." *State v. McCall*, 677 P.2d 920 (Ariz. 1983); *see also State v. Walton*, 769 P.2d 1017, 1032 (Ariz. 1989) (stating that "a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death"), *aff'd*, *Walton v. Arizona*, 497 U.S. 639 (1990) (finding constitutionally valid the Arizona Supreme Court's construction of the phrase "especially cruel"), *overruled on other*

---

[11]  The Court previously rejected on the merits Petitioner's claim that the State was required to show that Anthony suffered pain beyond the norm of other first degree murders, noting that the Arizona Supreme Court has never held that an (F)(6) cruelty finding is dependent on a comparative analysis of other cases. (Doc. 79 at 21–22.) Petitioner did not appeal this aspect of the Court's judgment. *Lopez*, 491 F.3d at 1032.

*grounds by Ring v. Arizona*, 536 U.S. 584 (2002). In light of this legal standard, the Court finds no reasonable likelihood of a different outcome had sentencing counsel secured expert testimony such as that proffered by Dr. Dunton concerning Anthony's level of pain or whether Petitioner should have been on notice that the child was in need of immediate medical attention.

The same is true for the suggestion that sentencing counsel should have enlisted an expert to question the reasonableness of Dr. Hobeich's assertion that Anthony was probably conscious and experiencing pain for at least 45 minutes to an hour during the three-hour gap between being beaten and losing consciousness. Petitioner does not dispute that the child was conscious for at least some period of time after he was beaten. His mother testified that when she returned home after leaving Anthony in Petitioner's care, Anthony "was kind of quiet—kind of playing with a little kitten. It's a stuffed animal." (RT 4/5/90 at 131.) She picked him up and held him for about a half hour before putting him down where he sat on the floor until he wanted to be picked up again. (*Id.* at 133–34.) At that point she noticed he felt hot and gave him a 15-minute bath before putting him in his bed and leaving the apartment to do laundry. (*Id.* at 134–35.) Based on this testimony, the Court finds no reasonable probability of a different result had an expert such as Dr. Dunton opined that the length of time Anthony likely suffered pain was indeterminable to a reasonable degree of medical certainty. *See State v. Benson*, 307 P.3d 19, 30 (Ariz. 2013) ("No particular period of time must pass to sustain a finding of cruelty.").

Second, the conclusion that Anthony suffered physical pain is only a partial basis for the Arizona Supreme Court's cruelty finding. Petitioner does not attempt to refute—with Dr. Dunton's affidavit or other evidence—the state court's finding that Anthony "must also have suffered some mental anguish while he remained conscious, knowing that one of the two people he depended on and trusted to care for and love him had beaten him repeatedly about the head and body and did nothing to stop the pain and comfort him." *Lopez*, 847 P.2d at 1091. Because the Arizona Supreme Court found mental anguish to be an independent basis supporting its finding that the murder was especially cruel, there is no reasonable probability

22

of a different outcome had PCR counsel pursued a claim alleging ineffective assistance of sentencing counsel for failing to investigate and present evidence to rebut Dr. Hobeich's testimony concerning Anthony's injuries.

Finally, Petitioner cannot establish prejudice from sentencing counsel's alleged deficiencies with regard to Dr. Hobeich because the state courts also found the alternative heinous/depraved prong of (F)(6). Under Arizona law, even if one of the (F)(6) prongs is rebutted, a finding of either especial cruelty or especial heinousness/depravity alone will establish the (F)(6) factor and the validity, or lack thereof, of the other prong does not affect the weight given to the circumstance. *See, e.g., State v. Djerf*, 959 P.2d 1274, 1288 (Ariz. 1998) (upholding (F)(6) factor based on cruelty finding alone without considering validity of depravity finding); *State v. Towery*, 920 P.2d 290, 310 (Ariz. 1996) (same); *State v. Bolton*, 896 P.2d 830, 852 (Ariz. 1995) (same); *see also State v. Roscoe*, 910 P.2d 635, 651–52 (Ariz. 1996) (upholding (F)(6) factor based on cruelty finding alone after invalidating depravity finding).

Petitioner argues that Dr. Hobeich's testimony "played a fundamental role" in the Arizona Supreme Court's finding that Anthony's murder was heinous and depraved. (Doc. 163 at 26.) Specifically, he cites the state court's opinion that Petitioner's failure to secure medical treatment for his son while Anthony "lay on the couch in pain, suffering seizures, according to the medical testimony, as a result of the injuries to his brain" demonstrated the "essence of depravity." *Lopez*,  847 P.2d at 1091. In focusing on these excerpts from the state court's opinion, Petitioner ignores its findings with regard to two of the specific factors required by Arizona law to establish depravity: senselessness and helplessness. *See State v. Gretzler*, 659 P.2d 1, 11 (Ariz. 1983) (identifying five factors to be considered in determining whether a defendant acted in a heinous or depraved manner). He further ignores the state court's oft repeated explanation that, unlike cruelty which considers a victim's pain and suffering, heinousness and depravity focus on a defendant's state of mind at the time of the murder. *Lopez*, 847 P.2d at 1091.

The Arizona Supreme Court explained in detail the factual basis for its findings that Anthony's murder was senseless and that he was helpless—unable to defend himself and incapable of seeking aid for his injuries. *Lopez*, 847 P.2d at 1091. It was in the context of the latter observation about seeking aid that the court observed Petitioner had taken "pains to make it appear that an accident had occurred" and refused to let Anthony's mother take him to the hospital. This Court concludes that Dr. Hobeich's testimony about Anthony being in pain and likely experiencing seizures was not "fundamental" to the state court's finding that Anthony was helpless. Moreover, Petitioner's own expert acknowledges that Anthony "certainly suffered pain from his injuries" and does not dispute Dr. Hobeich's testimony that Anthony might have lived had he received timely medical care. (Doc. 37, Ex. 4 at 2.) For these reasons, there is no reasonable probability expert testimony challenging Dr. Hobeich's opinions about the level of Anthony's pain and suffering would have altered the state court's findings in support of the heinous/depraved prong.

## IV.   Claim 12-B: Mitigation Evidence

In Claim 12-B, Petitioner alleges that sentencing counsel was ineffective for failing to investigate and present mitigating evidence. The parties dispute whether the claim was exhausted in state court. Because the Ninth Circuit in its 2007 opinion  reversed this Court's initial finding of procedural default and determined that Claim 12-B had been exhausted in state court (based on appellate arguments advanced by Petitioner), *see Lopez*, 491 F.3d at 1040-41, Respondents assert that Petitioner is judicially estopped from now arguing that the claim is unexhausted, procedurally defaulted, and excused from the default based on PCR counsel's ineffectiveness. After due consideration, the Court finds that judicial estoppel is not warranted here because Petitioner's changed position is based on an intervening change in the law.

Judicial estoppel is an equitable doctrine "intended to protect against a litigant playing 'fast and loose with the courts.'" *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). It is not a hard and fast rule, but seeks to prevent "intentional self-contradiction . . . as a means of obtaining unfair advantage." *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215 (9th

Cir. 1984) (quoting *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953). Additionally, numerous circuit courts have recognized that "judicial estoppel is inappropriate when a party is merely changing its position in response to a change in the law." *Longaberger Co. v. Kolt*, 586 F.3d 459 (6th Cir. 2009) (citing cases, including *Shamrock*, 729 F.2d at 1215).

The Ninth Circuit has recognized that *Martinez* represents a "remarkable" change in the law governing procedurally defaulted ineffective assistance of counsel claims. *Lopez (Samuel) v. Ryan*, 678 F.3d 1131, 1136 (9th Cir. 2012). In addition, the Ninth Circuit's April 2012 remand order directed this Court to consider how *Martinez* "applies to claims of ineffective assistance of counsel who failed to develop a factual record during the initial post-conviction relief proceedings." (Doc. 142 at 1.) Although the court did not specifically reference Claim 12-B, this Court's resolution of the claim following the Ninth Circuit's 2007 remand was the only issue pending on appeal at the time *Martinez* was decided. Further, in denying relief on the merits of Claim 12-B, this Court emphasized the failure of PCR counsel to develop facts and evidence to support the allegations concerning sentencing counsel's deficient mitigation investigation. (Doc. 130 at 16–17). Finally, to the extent Petitioner has changed his position regarding the exhaustion of Claim 12-B, so too have Respondents, who prior to *Martinez* argued to this Court that Petitioner's claim had not been properly exhausted in state court and was procedurally defaulted. (Doc. 38 at 27.) For these reasons, the Court declines to apply the doctrine of judicial estoppel.

### A.   Applicability of *Martinez*

The Court turns now to the question of how, if at all, *Martinez* affects its analysis of Claim 12-B. In remanding the case a second time, the Ninth Circuit directed the Court to consider whether *Martinez* applies when PCR counsel fails to develop the factual basis of a claim. Subsequently, and after completion of supplemental briefing by the parties, an en banc panel of the Ninth Circuit answered this question in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), holding that an IAC claim adjudicated on the merits in state court is

1   nonetheless unexhausted, and may be procedurally defaulted, if it is fundamentally altered
2   by new facts alleged in a federal habeas petition.

3   In *Dickens,* the petitioner argued in state court that his sentencing counsel provided
4   ineffective assistance by failing to direct the work of a court-appointed psychologist and to
5   adequately investigate the petitioner's background. *Id.* at 1317. The state court denied the
6   claim on the merits, finding that counsel's performance was not deficient and that the
7   petitioner had failed to demonstrate he was prejudiced. *Id.* In his federal habeas petition,
8   however, the petitioner "changed his claim to include extensive factual allegations suggesting
9   Dickens suffered from FAS and organic brain damage." *Id.*

10   In determining whether the petitioner's claim was unexhausted, the court in *Dickens*
11   explained that factual allegations not presented to a state court may render a claim
12   unexhausted if the allegations "fundamentally alter" the legal claim presented and considered
13   by the state courts. *Id.* at 1317 (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)). It
14   further observed that new evidence fundamentally alters a claim if it places the claim in a
15   significantly different and stronger evidentiary posture than it was in state court. *See Aiken*
16   *v. Spalding*, 841 F.2d 881, 883, 884 n.3 (9th Cir. 1988).

17   Applying these principles, the court found that Dickens's "new evidence creates a
18   mitigation case that bears little resemblance to the naked *Strickland* claim raised before the
19   state courts." *Id.* at 1319. It further noted that the claim urged in state court only "generally
20   alleged that sentencing counsel did not effectively evaluate whether Dickens 'suffer[ed] from
21   any medical or mental impairment'" and that specific conditions like FAS and organic brain
22   damage placed the claim in a "significantly different" and "substantially improved"
23   evidentiary posture. *Id.* Having determined that Dickens's fundamentally altered IAC
24   sentencing claim was unexhausted and procedurally barred, the court remanded for
25   consideration of cause and prejudice under *Martinez. Id.* It further instructed that 28 U.S.C.
26   § 2254(e)(2) did not bar the district court from hearing new evidence to determine the
27   existence of cause and prejudice.

28

26

In light of *Dickens*, the question of whether *Martinez* is applicable to Claim 12-B hinges on whether the claim as presented in these federal proceedings is fundamentally different than the one presented in state court.

*State Court Proceedings*

In July 1994, Petitioner sought post-conviction relief in state court. His PCR petition alleged numerous instances of ineffective assistance of counsel at trial and on appeal but did not assert deficient representation with respect to investigating or presenting mitigation evidence at sentencing. However, the issue of counsel's representation at sentencing was raised during a PCR evidentiary hearing and in post-hearing briefs.

At the evidentiary hearing, lead trial attorney Sean Bruner testified that his focus for the mitigation case was to show another side of Petitioner—that he had contributed to the community and was a good person. (RT 5/3/95 at 89.) In addition to developing character evidence, Bruner requested a mental health evaluation of Petitioner by Dr. Larry Morris, in part to see if an expert would provide any helpful mitigating evidence.[12] (RT 5/2/95 P.M. at 42, 43–44, 51.) He did not provide any specific guidance to the doctor, but simply requested a mental health evaluation. (*Id.* at 44.) Bruner did not recall obtaining any of Petitioner's school, work, or medical records (*id.* at 36); he later testified that he reviewed some records from Petitioner's work for the City of Tucson (*id.* at 40–41). It occurred to Bruner to investigate whether Petitioner had problems with alcohol, but he testified he found no such evidence. (*Id.* at 40.)

Bruner recalled that his associate counsel, Jacqueline Marshall, dealt more with Petitioner's family and character witnesses than did he; the defense investigator did not conduct any social history work. (*Id.* at 36–40, 52–53.) Marshall had been a member of the bar for approximately four years at the time of Petitioner's trial and had done several trials but had not worked on a capital case. (RT 5/3/95 at 103–04.) She testified that she had a

---

[12] Dr. Morris did not prepare a report, and the defense did not call him to testify at the aggravation/mitigation hearing.

larger role in Petitioner's sentencing than at trial and had explored the mitigating factors. (*Id.* at 105.)

Dr. Morris, the psychologist who evaluated Petitioner prior to trial, testified that Bruner asked him to do a general evaluation of Petitioner's psychological makeup in light of the two allegations against Petitioner: molesting his stepdaughter and killing his son.[13] (RT 5/2/95 P.M. at 59, 61, 63.) Dr. Morris reviewed some police reports, interview transcripts, hospital records, and an autopsy report, but did not have any of Petitioner's school records, medical records, or family information. (*Id.* at 62–63.) Dr. Morris did a clinical interview of Petitioner regarding his social history and obtained a chronology of his life. (*Id.* at 64.) Petitioner told Dr. Morris that he had drinking problems in the past but had stopped drinking and doing drugs about three years prior to the time of the interview. (*Id.* at 68.) When Dr. Morris administered the MMPI, a commonly used clinical test to assess personality, all of the scales were within normal range. (*Id.* at 72.) Petitioner expressed regret about what had happened to his son and indicated to Dr. Morris that he loved Anthony. (*Id.* at 76.)

Defense attorney Carla Ryan testified as to the standard of care for counsel representing a defendant charged with a capital crime and opined that a depressed state and alcohol abuse were possible mitigators relevant to Petitioner. (RT 5/3/95 at 51–52.) She noted that Petitioner's parents may have been alcoholics but that no testing was done to determine if Petitioner suffered potential effects therefrom such as personality disorder or fetal alcohol syndrome. (*Id.* at 52.) She also noted that school records indicated Petitioner received low grades, had a second or third grade reading level in eighth grade, and failed to graduate from high school; thus, in her view, Bruner should have tested for learning disabilities. (*Id.* at 52, 58.) Ryan further opined that because Bruner failed to provide Dr. Morris with a full social history regarding Petitioner, the expert did not have sufficient information to prepare a mitigation-related report. (*Id.* at 61, 65–66.)

---

[13] Shortly before his murder conviction, Petitioner was convicted of molesting his teenage stepdaughter.

The parties filed post-hearing briefs and proposed findings of fact and conclusions of law. With regard to sentencing IAC, Petitioner argued that Bruner had been poorly prepared for sentencing, inexplicably delegated responsibility for mitigation preparation to co-counsel lacking in significant trial experience, and failed to give sufficient direction to Dr. Morris. (ROA 393–94.) In his proposed conclusions of law, Petitioner asserted that "Mr. Bruner was ineffective when he failed to give directions to Dr. Morris" and "Mr. Bruner was ineffective when he delegated the sentencing to inexperience [sic] junior counsel."  (ROA 418.)

The PCR court denied relief, concluding that Bruner was not ineffective for failing to investigate and present evidence of alcoholism. (ROA 458–49.) The state court's ruling was taken substantially from the State's proposed findings of fact and conclusions of law (ROA 436–37; ROA 448) and did not address any of the specific allegations identified in Petitioner's post-hearing briefing. In a petition for review to the Arizona Supreme Court, PCR counsel again asserted that Bruner had failed to give direction to Dr. Morris other than wanting to know Petitioner's "overall personality dynamics" and wrongly delegated mitigation preparation to inexperienced co-counsel. The supreme court summarily denied review.

*Federal Court Proceedings*

In 1997, Petitioner initiated these federal proceedings and filed a lengthy petition for habeas corpus relief. He alleged constitutionally deficient representation based on Bruner's failure to investigate the following facts:  Petitioner was raised in a dysfunctional, impoverished environment by alcoholic parents who frequently became violent with one another; his mother drank alcohol during her pregnancies, making Petitioner a strong candidate for FAS; Petitioner suffered at least four major head traumas, likely resulting in organic brain damage; Petitioner was sexually assaulted as a child; Petitioner had a good employment record; and Petitioner expressed remorse for his actions. (Doc. 36 at 83–91.)

*Fundamentally Altered Claim*

The Court determined in its December 3, 1999 order regarding the procedural status of Claim 12-B that Petitioner's allegations of sentencing counsel's alleged deficiencies in

29

developing and presenting mitigation had not been exhausted in state court and were procedurally barred. (Doc. 53 at 25–26.) A plain reading of the factual allegations in state and federal court demonstrates that the two claims have little in common other than the basic premise that sentencing counsel failed to conduct a constitutionally sufficient investigation and presentation of mitigating evidence. State PCR counsel's arguments focused on Bruner's failure to provide guidance to Dr. Morris and delegation of sentencing responsibilities to inexperienced co-counsel. Although his expert witness at the state evidentiary hearing made a passing reference to counsel's failure to investigate whether Petitioner suffered from fetal alcohol-related problems, PCR counsel did not make that assertion in either post-hearing briefing or the petition for review to the Arizona Supreme Court. Federal habeas counsel's arguments, on the other hand, focused on the failure to investigate possible organic brain damage from head traumas and in utero exposure to alcohol as well as Petitioner's dysfunctional upbringing, victimization from a sexual assault, good employment history, and remorse.

Although it appears plainly that the allegations in Petitioner's federal habeas petition fundamentally altered the claim asserted in state court, thus rendering it unexhausted, the Court cannot disregard the Ninth Circuit's decision in 2007 reversing this Court's imposition of a procedural bar based on lack of exhaustion. In that decision, the court determined Claim 12-B was exhausted based on Petitioner's "general allegations of his counsel's lack of penalty phase preparation to the Arizona Supreme Court (including improper delegation to an inexperienced subordinate and the failure to prepare mental health experts)." *Lopez*, 491 F.3d at 1041. For two reasons, the Court concludes that it is not bound by this finding of exhaustion.

First, the court in *Lopez* expressly recognized that in these federal habeas proceedings Petitioner wished to supplement the record with additional evidence. *Id.* at 1041 n.8. In so doing, it did not expressly address the question of whether such evidence fundamentally altered the claim the court determined had been exhausted in state court. *Id*. Instead, the appellate court left it to this Court on remand to determine whether an evidentiary hearing

30

1    or expansion of the record was warranted. *Id.*

2          Second and more critically, the en banc decision in *Dickens* compels a finding here

3    that Petitioner's new allegations either fundamentally altered the claim considered by the

4    state courts, *Vasquez*, 474 U.S. at 260, or placed the claim "in a significantly different and

5    stronger evidentiary posture than it was when the state courts considered it," *Aiken*, 841 F.2d

6    at 883. As in *Dickens*, the allegations presented in Petitioner's federal habeas petition bear

7    "little resemblance to the naked *Strickland* claim raised before the state courts." *Dickens*,

8    740 F.3d at 1319. For example, similar to *Dickens*, Petitioner's state PCR counsel raised only

9    general allegations concerning sentencing counsel's failure to "direct the work of the court-

10   appointed psychologist" and adequately investigate the petitioner's background. *Id.* at 1317.

11   And like the petitioner in *Dickens*, Petitioner here "changed his claim to include extensive

12   factual allegations suggesting [Petitioner] suffered from FAS and organic brain damage."

13   *Id.* The similarities between Petitioner's case and that of the petitioner in *Dickens* are striking

14   and compel a finding, notwithstanding the *Lopez* court's exhaustion ruling, that the new

15   allegations and evidence presented in Claim 12-B fundamentally altered Petitioner's

16   previously exhausted IAC claim. *See United States v. Gonzalez-Zotelo*, 556 F.3d 736, 740–41

17   (9th Cir. 2009) (explaining that a district court was bound to follow the reasoning of prior

18   circuit authority unless it had been "effectively overrule[d]" or was "clearly irreconcilable"

19   with higher authority); *Miller v. Gammie*, 335 F.3d 889 (2003) (en banc) (holding that

20   district court or a three-judge appellate panel is free to reexamine the holding of a prior panel

21   opinion in light of an inconsistent decision by a higher court). Because the new allegations

22   and evidence presented in Claim 12-B have never been presented to the state courts, the

23   Court must determine the procedural status of this unexhausted, but potentially procedurally

24   defaulted claim.

25          **B.  Exhaustion and Procedural Default**

26          Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that

27   the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see*

28   *Coleman*, 501 U.S. at 731; *Rose v. Lundy*, 455 U.S. 509 (1982).

Because Claim 12-B was not presented to the state courts, it may be procedurally defaulted if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman* 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available, Petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1. If, however, "it is not clear that the Arizona courts would hold [Petitioner's claim] barred" under Arizona law, this Court should not find Petitioner's claim procedurally defaulted. *Cassett v. Stewart*, 406 F.3d 614, 622-23 (9th Cir. 2005); *see e.g., Teague v. Lane*, 489 U.S. 288, 325-26 (1989) (Stevens, J., concurring in part and dissenting in part) (recommending deferral of procedural default issue to state court in the absence of an unequivocal conclusion that no state remedies remain).

Although Respondents do not directly address the issue of whether there is an available state remedy to address Claim 12-B, they do contend that, if Petitioner's fundamentally altered IAC claim has never been presented, it could not have been found procedurally defaulted and this Court may not consider it in this limited remand. The Court agrees that Petitioner's fundamentally altered claim, as such, has not been found procedurally defaulted. The Court, however, disagrees that this determination is outside the scope of the Ninth Circuit's remand. The Ninth Circuit recognizes that on remand, "courts are often confronted with issues that were never considered by the remanding court." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (citing *Biggins v. Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997)). Thus, upon receipt of the mandate of an appellate court, this Court is free to do anything not "foreclosed by" the mandate or that does not run counter to the "spirit" of the circuit court's decision. *Cassett*, 406 F.3d at 621 (quoting *Kellington*, 217 F.3d at 1092-93)).

In this case, the Ninth Circuit directed this Court to determine how *Martinez* applies to IAC claims adjudicated but not factually developed during an initial state PCR proceeding

32

due to the ineffectiveness of PCR counsel. (Doc. 142.) This Court, however, "may consider the opinion the mandate purports to enforce as well as the procedural posture and substantive law from which it arises." *Kellington*, 217 F.3d at 1093. As previously explained, at the time this case was remanded, the en banc panel in *Dickens* had not yet held that an IAC claim adjudicated on the merits in state court is nonetheless unexhausted if it is fundamentally altered by new facts alleged in a federal habeas petition. *Dickens*, 740 F.3d 1302. The decision in *Dickens*— premised on the Supreme Court's decision in *Martinez*, which formed the substantive law from which the Ninth Circuit's remand order derived— places the Ninth Circuit's mandate in a new light and Claim 12-B in a fresh procedural posture. Thus, this Court may determine in the first instance whether the claim is unexhausted, and, if so, whether or not there is any available remedy in state courts to address this claim, without running afoul of the mandate in this case. This determination of the procedural status of Petitioner's claim is consistent with the "spirit" of the circuit court's decision, which plainly contemplates an analysis of the procedural posture of Petitioner's claim in light of the new evidence and allegations presented for the first time to this Court.

Having resolved that this Court may determine if Petitioner's fundamentally altered claim is procedurally defaulted under the Ninth Circuit's mandate, the Court now turns to the question of available state remedies. Ordinarily, if Petitioner were to return to state court and attempt to litigate an unexhausted IAC claim, it would be found waived and untimely under Rule 32.2(a)(3), Arizona Rules of Criminal Procedure ("Ariz. R.Crim.P."). *See e.g., Hurles v. Ryan*, 752 F.3d 768, 779-80 (9th Cir. 2014) (finding IAC claims which petitioner failed to exhaust would, upon presentation to state court, be dismissed pursuant to Ariz. R. Crim P. 32.2); *Stewart v. Smith*, 46 P.3d 1067, 1071 (Ariz. 2002) (holding that IAC cannot be raised repeatedly because it offends the strong policy against piecemeal litigation). The preclusive effect of Rule 32.2(a), however, may be avoided if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or his failure to present the claim in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a). In December 2000, Arizona amended its Rule 32 state post-conviction procedures,

adding a new avenue of relief from a death sentence if "[t]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish ... that the court *would not have imposed the death penalty*." Ariz. R.Crim. P. 32.1(h) (emphasis added). At the heart of Petitioner's IAC claim is a heavily fact dependent claim that, in light of new evidence of mitigation that counsel failed to develop at trial, a reasonable sentencer would not have imposed the death penalty.

Unlike the Supreme Court's conclusion that "innocence of the death penalty," as that term applies to a so-called "gateway" claim, means only that no circumstances exist making a defendant eligible for the death penalty, *see Sawyer v. Whitley*, 505 U.S. 333, 350 (1992), it is not readily apparent from the plain language of Rule 32.1(h) that this ground for relief is available only to petitioners alleging facts that would establish statutory ineligibility for the death penalty under Arizona law. Neither is this Court aware of any published state court authority endorsing, or indeed rejecting, such an interpretation. Thus, it is not clear to this Court that, under Arizona law, the Arizona courts would hold Petitioner's claim barred if Petitioner were to return to state court to present this claim under the Rule 32.1(h) exception. In the absence of an unequivocal bar, this Court is not inclined to find Petitioner's claim procedurally defaulted, but defer such a decision to the state courts. *See Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.2004) ("Principles of comity and federalism counsel against substituting our judgment for that of the state courts...."); *Cassett*, 406 F.3d at 622-23.

The Court finds that additional briefing is necessary to determine whether an appropriate state court remedy exists and is available to Petitioner under Rule 32.1(h), Ariz. R. Crim. P., for the purposes of exhausting Claim 12-B. Therefore, the parties are directed to file simultaneous briefs addressing this issue, limited to seventeen (17) pages. The parties may submit a responsive brief, limited to ten (10) pages. The Court discourages repetition of facts and argument already briefed; the parties should instead simply reference prior pleadings as necessary.

**CONCLUSION**

Pursuant to the Ninth Circuit's directive on remand, the Court has reconsidered three claims in light of *Martinez*. Because Petitioner failed to demonstrate a reasonable probability of a different result had Claims 12-A and 12-E been raised in state PCR proceedings, the Court finds that he has not demonstrated cause and prejudice under *Martinez* and those claims remain procedurally barred. The Court finds that further briefing is necessary to determine whether a state remedy exists and is available to Petitioner under Rule 32.1(h) to address the allegations raised in Claim 12-B.

Based on the foregoing,

**IT IS ORDERED** denying Claims 12-A and 12-E as procedurally barred.

**IT IS FURTHER ORDERED** that the parties shall each file a brief, not in excess of seventeen (17) pages, regarding the issue set forth above, no later than November 6, 2015. The parties may file a brief in response, not in excess of ten pages (10), no later than November 20, 2015. No reply to any response shall be filed.

DATED this 5th day of October, 2015.

Cindy K. Jorgenson
United States District Judge